**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| 28th STREET SUPERIOR HOSPITALITY, )<br>INC., )<br> )<br>      Plaintiff, )<br> )<br>v. )<br> )<br>THE CINCINNATI INSURANCE )<br>COMPANY, )<br> )<br>      Defendant. ) | Cause No. 1:19-CV-511-HAB |

**OPINION AND ORDER**

The insurance policy issued by Defendant to Plaintiff provides that, if a loss occurs, Defendant will only pay the lesser of the appraised value of the loss or the amount Plaintiff spent repairing. The issue before the Court is a simple one: must Plaintiff document the exact amount it spent on repairs? Believing that Plaintiff must, Defendant has refused to pay anything more than the actual cash value ("ACV") for a fire loss it insured. Plaintiff believes Defendant's refusal is a breach of the policy and a breach of the duty of good faith.

The Court finds no support for Defendant's expansive reading of its own policy, either in the policy itself or the case law. What's more, Defendant has no evidence, other than its "beliefs," that Plaintiff paid less than the appraised value of the loss. Because Plaintiff has designated undisputed evidence that it did spend more on repairs than the appraised value, it is entitled to summary judgment on its breach of contract claim. Whether Defendant's breach was in bad faith is an issue for a jury.[1]

---

[1] Defendant also filed a Motion to Strike (ECF No. 37). Because the Court can distinguish which exhibits, affidavits, and statements may properly be considered when deciding whether summary judgment is appropriate, the Court denies the motion. The Court has noted the Defendant's objections and has considered the objections when they arose in the

## I.     Factual Background

In November 2015, a fire occurred at a Fort Wayne hotel owned by Plaintiff ("Property"). The Property was insured by Defendant under Policy No. INN 000 04 01 with effective dates of January 2013 through January 2016 ("Policy"). Plaintiff reported the loss to Defendant the day after the fire.

At the beginning of April 2016, Plaintiff made a formal claim for payment under the Policy. The claim asserted an ACV of $2,474,177.78 and a replacement cost value ("RCV") of $2,647,855.97. Defendant, through a third-party adjuster, rejected Plaintiff's claim six weeks later. Defendant placed the ACV at $1,288,191.78[2] and the RCV at $1,493,415.74.

Given the large gap in the parties' estimates, Plaintiff invoked the Policy's appraisal provision in June 2016. That provision provided:

> If we and you disagree on the value of the property, the amount of Net Income and operating expense, or the amount of "loss", either may make written demand for an appraisal of the "loss". In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property, the amount of Net Income and operating expense, and the amount of "loss". If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding.

(ECF No. 40-1 at 52). Plaintiff also submitted a sworn proof of loss, showing an ACV of $2,631,049.80 and an RCV of $2,804,728.49.

The appraisal process concluded in May 2017 with an appraisal award. The award determined the ACV of the loss to be $2,053,797.35 and the RCV to be $2,283,417.65. The parties

---

Court's summary judgment analysis. The Court also notes that, in reaching its summary judgment conclusions, it did not rely on any of the materials that formed the basis for Defendant's objection.

[2] Plaintiff did not receive a check for this ACV amount until late November 2016.

refer to the difference between these numbers as "recoverable depreciation." Defendant issued a check for $765,615.57, the difference between its ACV calculation and the appraisal award, four days after the award was entered.

Almost one year later, Plaintiff advised Defendant that repairs on the Property had been completed. Plaintiff submitted forty-seven (47) checks, which it claimed showed payments for the repairs, totaling more than the appraised RCV. The checks came with a waiver of lien from Plaintiff's contractor in the same amount. Plaintiff demanded payment of the recoverable depreciation under the Policy's RCV loss payment provision which provided:

> **e.**    We will not pay more for "loss" on a replacement cost basis than the least of:
>
> **(1)**    The Limit of Insurance applicable to the lost or damaged property;
>
> **(2)**    The cost to replace, on the same "premises", the lost or damaged property with other property;
>
> > **(a)**    Of comparable material and quality; and
> >
> > **(b)**    Used for the same purpose; or
>
> **(3)**    The amount you actually spend that is necessary to repair or replace the lost or damaged property.

(*Id*. at 58) (hereinafter the "RCV loss payment provision"). The parties agree, generally, that the appraised RCV is the subsection (2) amount.

Defendant rejected Plaintiff's payment demand. Unsatisfied with the lack of specificity on the checks or the lien waiver, Defendant asked Plaintiff to provide "corresponding itemized invoices," "the contractor's itemized draw requests and any other available documentation to support that these payments were for repairs allotted under this claim." (ECF No. 29-2 at 23). Defendant's primary concern, it seems, was that the amounts reflected in the checks and waiver of lien were, at least in part, payment for other work done to the Property. In response, Plaintiff stated

that it did not have the requested documents and that Plaintiff had "provided [Defendant] the only documentation available to [Plaintiff]." (*Id*. at 24).

With no documentation forthcoming, Defendant asked to inspect the Property to verify the repairs. Defendant inspected the Property twice in May 2018.[3] After those inspections, Defendant's Field Claims Superintendent, Corey Linder ("Linder") told his superiors that "all repairs were completed," though he did note "several changes . . . along with a number of upgrades throughout the building." (ECF No. 32-3 at 28). Linder also told his superiors that Defendant had paid a previous wind damage claim to the Property based on "similar documents" and an inspection. (*Id*.).

Just days after the second inspection, Plaintiff again demanded payment of the recoverable depreciation. This time it included a letter from the appraisal umpire, Steven Morris ("Morris"), in which Morris contended that Plaintiff need only provide "proof of completion of repairs and proof of payment incurred to make those repairs in order to make claim for the withheld depreciation." (*Id*. at 35). Defendant again declined, stating that it was "unable to determine if any replacement cost payment is due because the information provided to date is too vague and incomplete." (*Id*. at 37). Instead of additional documents, Defendant requested a "thorough inspection" of the Property. (*Id*. at 38, 39, 41). Defendant anticipated the inspection would take "2-3 hours" and requested that Plaintiff's contractor be present. (*Id*.).

Plaintiff refused Defendant's request for another inspection, noting that Plaintiff "has twice provided [Defendant's] consultants full access to the" Property. (*Id*. at 42). Plaintiff continued to assert that the documentation it provided was enough, and again demanded payment of the recoverable depreciation. This refusal prompted Defendant to "deny any payment for the

---

[3] It appears from the correspondence that Defendant asked Plaintiff's contractor to be present during the inspections. That did not occur. And Defendant had limited access to the Property during the first inspection.

replacement cost of the" Property." (*Id*. at 44). In support of its denial, Defendant, relying on the RCV loss payment provision quoted above, stated:

> As you can see it is essential that the insured provide information that substantiates the cost it incurred to "repair or replace the lost or damaged property." In this instance the insured has provided documentation of the cost it incurred to complete its renovation and improvement of the property while, at the same time, repairing the lost or damaged property. Since the entire structure was not destroyed and because there was work done by the contractor that did not relate to the necessary repairs, information as to the overall cost of the project does not satisfy the requirements of the policy. While we have confirmed repairs were completed along with the unrelated renovations and other improvements noted above the documentation provide does not provide the cost to repair or replace the lost or damaged property. While we have made multiple efforts to acquire the necessary information and offered to seek it out from others if possible, your client has refused to supplement the documentation provided.

(*Id*. at 44). This suit was filed four months after Defendant's denial.

## II.    Legal Analysis

### A.    *Summary Judgment Standard*

Although state law provides the substantive law in a diversity action, the summary judgment procedure is governed by federal law. *Maroules v. Jumbo, Inc.*, 452 N.E.3d 639, 645 (7th Cir. 2006). Twenty-five years ago, the Indiana Supreme Court observed, rightly, that the Indiana state summary judgment standard and the federal summary judgment standard are very different.

> Under Indiana's standard, the party seeking summary judgment must demonstrate the absence of any genuine issue of fact as to a determinative issue, and only then is the non-movant required to come forward with contrary evidence.
>
> * * *
>
> In this respect, Indiana's summary judgment procedure abruptly diverges from federal summary judgment practice. Under the federal rule, the party seeking summary judgment is not required to negate an opponent's claim. The movant need only inform the court of the basis of the motion and identify relevant portions of the record which it believes demonstrate the absence of a genuine issue of material fact. The burden then rests upon the non-moving party to make a showing sufficient to establish the existence of each challenged element upon which the non-movant has the burden of proof. Indiana does not adhere to *Celotex* and the federal methodology.

5

*Jarboe v. Landmark Comm. Newspapers of Ind., Inc.*, 644 N.E.2d 118, 123 (Ind. 1994) (citations omitted). While Indiana does not follow the procedure set forth in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), federal courts, including this one, do. Therefore, in this case the burden is on the non-moving party to establish the existence of the elements he would have to prove at trial. Failure to do so dooms his claim no matter what an Indiana court may do on the same facts, since "[f]ederal courts may grant summary judgment under Rule 56 . . . even if the state would require the judge to submit an identical case to the jury." *Carson v. ALL Erection & Crane Rental Corp.*, 811 F.3d 993, 998 (7th Cir. 2016).

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in their favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists cannot create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences

in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). A court is not "obliged to research and construct legal arguments for parties, especially when they are represented by counsel." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

That the parties have cross-moved for summary judgment[4] does not alter the standard. When evaluating each side's motion, the court simply "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561–62 (7th Cir. 2002) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

**B.** ***The Policy's Suit Limitation Provision Does Not Bar Coverage***

As an apparent fallback position, though one that must be addressed first by the Court, Defendant meekly suggests that the suit limitation provision in the Policy "may bar coverage in this matter." (ECF No. 28 at 24). It does not.

The relevant provision provides:

No one may bring a legal action against us under this Coverage Part unless:

\*   \*   \*   \*

**2.**   The action is brought within 2 years after the date on which the direct physical "loss" occurred."

(ECF No. 40-1 at 24). Defendant appears to argue that, by participating in the contractual appraisal process and providing documents other than those Defendant requested, Plaintiff violated this provision. Indeed, this suit was filed almost four years after the fire.

---

[4] Although Plaintiff never formally filed a motion for summary judgment, Defendant has recognized that Plaintiff's response brief requested entry of summary judgment in Plaintiff's favor on the breach of contract claim. (ECF No. 35 at 1, n.1). Defendant's reply brief is also its response to Plaintiff's request for partial summary judgment.

"It is well established in Indiana that, while not favored, . . . contractual limitations shortening the time to commence suit are valid, at least so long as a reasonable time is afforded." *Schafer v. Buckeye Union Ins. Co*., 381 N.E.2d 519, 522 (Ind. Ct. App. 1978). The "purpose of such provisions concerns not a specific date following the loss but unreasonable delay in proceeding to enforce or pursue the claim." *Id*. at 523, n.5. That is, these limitations protect insurers from policy holders who voice no claim until the limitation period has long since expired, promote early notification while evidence is available, and provide carriers with a basis for forming business judgments on claim reserves and premium rates. *Id*. at 523.

Such limitations provisions may be waived either expressly or impliedly. *Id*. at 522. "'A waiver or estoppel may result from acts of [an] insurer causing [an] insured or claimant under the policy to delay bringing suit until after the time provided for in the policy.'" *Huff v. Travelers Indem. Co*., 363 N.E.2d 985, 991 (Ind. 1977) (quoting 46 C.J.S. Insurance § 1264 (1946)). The Indiana Court of Appeals has described its analysis of implied waivers as follows:

> [C]ontractual limitation periods may be waived by an insurer if its conduct is sufficient to create a reasonable belief on the part of the insured that strict compliance with the policy provision will not be required. The focus of our inquiry then is upon the relationship between the parties, seeking to determine "whether anything has been done . . . which would cause the insured to reasonably believe the limitation period will not be insisted upon." If such a belief has been fostered by the insurer, it may no longer raise the limitation period as a defense. "To hold otherwise," . . . "would be to allow the insurer to lull an insured into not pressing his rights and then deny liability on the basis of the limitation period."

*Wingenroth v. American States Ins. Co*., 455 N.E.2d 968, 970 (Ind. Ct. App. 1983) (citations omitted).

Defendant waived the suit limitation provision. As late as September 2018, just over a year before suit was filed, Defendant stated in its letters to Plaintiff that it "remain[ed] committed to making an appropriate replacement cost payment for this claim." (ECF No. 32-3 at 41). Even

Defendant's denial letter left open the door for further discussions, stating, "[t]his coverage position is based on the information presently available to us. Should you have additional information and/or documentation that you believe may impact our decision, please forward it to the undersigned for further review and consideration." (*Id*. at 44).

The Court finds the holding of *Schafer* to be dispositive. There, the policy contained a provision that any suit against the insurer needed to be filed within one year of the loss. The insureds timely gave notice of their claim and negotiated the value of the loss for more than a year. "While some of the correspondence from the insurers closed with a general statement that the company did not thereby intend to waive any of its rights under the policy, at no time did the insurers expressly advise [the insureds] of the one year suit limitation or their intent to rely upon it." *Schafer*, 381 N.E.2d at 520. With the negotiations at an impasse, the insureds filed suit just shy of the two-year anniversary of the loss.

The insurers moved for summary judgment based on the suit limitation clause. The motion was granted by the trial court. The Indiana Court of Appeals reversed. After reviewing the public policy arguments for and against strict application of the limitation clause, the court held, "where, as here, an insurance carrier does not deny coverage or liability, and proceeds to negotiate with the insured toward settlement of the claim, the law will imply a waiver of the contractual limitation for the bringing of suit, unless and until the insurer puts the insured on notice that litigation is necessary if he desires to pursue the claim further." *Id*. at 523.

This holding makes good sense and resolves the issue here. For more than three years, Defendant was part of an interactive process to adjust Plaintiff's claim. It repeatedly represented to Plaintiff that it was "committed" to pay an appropriate RCV. It was not until July 2019, almost four years after the loss, that Defendant finally denied Plaintiff's claim. Not until this denial did

Plaintiff have reason to believe that its claim would not be paid. And Plaintiff filed suit within four months of that denial. The Court finds no basis in fact or law to conclude that this case is barred by the suit limitation clause.

**C.**     ***The Policy Does Not Require an Exact Accounting of Repair Costs***

The parties agree that the relevant policy language is the RCV loss payment provision. They also agree that the provision is clear and unambiguous. What that clear and unambiguous provision requires, however, is the subject of heated debate. Defendant argues that an exact accounting of repair costs is a "condition precedent for payment of the replacement cost value." (ECF No. 28 at 19). Plaintiff, on the other hand, argues that the issue is not whether it can account for repair costs "to the penny," but "whether the amount that was spent on fire repairs exceeded the amount of the appraisal award." (ECF No. 32 at 17). The Court agrees with Plaintiff.

Under Indiana law, construction of insurance policies is governed by the same rules of construction as other contracts. *Buckeye State Mut. Ins. Co. v. Carfield*, 914 N.E.2d 315, 318 (Ind. Ct. App. 2009).

> As with other contracts, the interpretation of an insurance policy is a question of law. When interpreting an insurance policy, our goal is to ascertain and enforce the parties' intent as manifested in the insurance contract. We construe the insurance policy as a whole and consider all of the provisions of the contract and not just the individual words, phrases or paragraphs. If the language is clear and unambiguous, we give the language its plain and ordinary meaning. An ambiguity exists where a provision is susceptible to more than one interpretation and reasonable persons would differ as to its meaning. However, an ambiguity does not exist merely because the parties proffer differing interpretations of the policy language.

*Id*. (citations omitted). In interpreting insurance contracts, the Court must look to harmonize the provisions, rather than leave them in conflict. *Vann v. United Farm Fam. Mut. Ins. Co*., 790 N.E.2d 497, 504 (Ind. Ct. App. 2003).

The Indiana Supreme Court explained the difference between ACV coverage and RCV coverage nearly four decades ago.

> The actual cash value policy is a pure indemnity contract. Its purpose is to make the insured whole but never to benefit him because a fire occurred. Replacement cost coverage, on the other hand, reimburses the insured for the full cost of repairs, *if he repairs or rebuilds the building*, even if that results in putting the insured in a better position than he was before the loss.

*Travelers Indem. Co. v. Armstrong*, 442 N.E.2d 349, 352 (Ind. 1982) (original emphasis) (citations omitted). A windfall to the insured is contemplated by the parties to an RCV policy, and, in turn, "it is more expensive because the rate of premiums is higher and the amount of insurance to which that rate applies is usually higher." *Id.* at 353.

Because insurance policies are increasingly standardized, the interpretation of a specific provision can be the focus of litigation throughout the country. So it is with the RCV loss payment provision. Conducting its own research, the Court has identified six cases from different jurisdictions, each interpreting the quantum of proof necessary for an insured to recover under the same language used by Defendant in the RCV loss payment provision. Most of those cases support Plaintiff's reading.

The Court begins with *Bowlers' Alley, Inc. v. Cincinnati Ins. Co.*, 708 F. Supp. 3d 543 (E.D. Mich. 2015), for the obvious reason that it involved Defendant and Defendant's policy. There, Cincinnati claimed that the plaintiff's "failure to provide documents to substantiate the various specific line items claimed in the sworn proof of loss" was a breach of a "condition precedent" to bringing legal action. The district court rejected that contention.

> In this case, there is no dispute that the plaintiff submitted its "sworn interim proof of loss" by the extended deadline to which the insurer agreed. The dispute here is not over whether the proof of loss was timely or sworn, but whether the documents and other information submitted in support of the proof of loss were sufficient to establish that the plaintiff was entitled to coverage for the amounts stated. It is undisputed that the interim sworn proof of loss was timely submitted and properly

11

> signed. The proof of loss stated specific amounts that the insured claimed, and it is
> undisputed that "some" documentation was included with it. Cincinnati denied the
> claim on the basis that the items listed were unsubstantiated, unnecessary, excluded
> under specific provisions, or not covered by the policy at all. In that sense, the proof
> of loss certainly was sufficient for the insurer to make a timely review of the claim
> and to determine that it was not obligated to pay.

*Id*. at 571. This language is clear: submission of a proof of loss is a condition precedent, documentary support for that proof of loss is not.

This is not to say that the district court allowed recovery for unsupported claims. Indeed, the district court rejected several claimed items of loss for which the insured provided inadequate support. *Id*. at 559–66. That said, the decision is relevant here because it specifically rejected the idea that a lack of *documentary* proof entitled Cincinnati to summary judgment.

One of the items claimed by the insured was cash payments made to various individuals as part of the loss remediation. Cincinnati claimed that the insured could not recover these amounts because they were not supported through invoices, receipts, and the like. Again, the district court rejected this assertion.

> As to the claim for cash payments made to various individuals, the plaintiff has
> offered his own testimony that the payments were made, in the amounts stated, for
> the services listed. The insurer does not contend that the services were not necessary
> to the repair process or beyond the scope of coverage, only that they are
> unsupported by any documentation such as canceled checks, invoices, or receipts.
> But it does not dispute that the plaintiff has offered all that it says [it] has to
> substantiate those amounts, which is the plaintiff's owner's sworn statement. The
> insurer found that support inadequate to justify payment, and the jury may as well.
> But there is nothing in the record to suggest that the plaintiff failed to cooperate to
> the extent of providing all the information in its possession to support its claim for
> the "labor hours" line item.

*Id*. at 572. Thus, the district court allowed this claim to go to a jury.

A similar conclusion was reached in *Michel Family Tr. v. Travelers Indem. Co. of Conn.*, No. C 09-4144 PSG, 2011 WL 207955 (N.D. Cal. Jan. 21, 2011). In *Michel*, the insurer, relying on the same RCV loss payment provision, refused to pay more than the ACV value of a fire loss

12

until the insured proved that it paid more than ACV for the repairs. Moving for summary judgment, the insurer pointed to the insured's interrogatory responses that stated it had spent some $200,000.00 less than ACV on repairs. In response to the insurer's summary judgment, however, the insured submitted a declaration claiming that it had paid almost $100,000.00 more than the ACV on repairs. The declaration appeared to be the only evidence of payments submitted by the insured.

The district court found that the declaration was enough to avoid summary judgment. It concluded that "the statement in the declaration regarding the amount the [insured] has spent on repairs is sufficient evidence for a reasonable jury to conclude that the amount the [insured] spent that was necessary to make repairs exceeds" the ACV. *Id.* at *6. Finding a genuine issue of material fact, the insurer's motion for summary judgment was denied.

*Dewey St. Church of Christ v. Church Mut. Ins. Co.*, 2:19-CV-12-KS-MTP, 2020 WL 7133003 (S. D. Miss. Dec. 4, 2020) is another example. In that case, the insured's building was damaged by a tornado. The parties disagreed as to the total damage cost. Arguing that it had paid for all damages in its ACV payment, the insurer, again relying on the same RCV loss payment provision, denied any claim for further payment. The insurer rejected the insured's repair estimates, arguing that the estimate included amounts beyond the scope of necessary repairs. After the insured sued, the insurer sought summary judgment on the breach of contract claim.

Once again, the district court rejected the insurer's position.

The record contains sufficient evidence to prove Plaintiff's alleged damages with a reasonable degree of accuracy. Defendant admits that Plaintiff provided estimates that include the damage allegedly caused by the 2017 storm, but Defendant contends that those estimates are over-inclusive, incorporating other damages which Plaintiff's causation expert did not identify as having been caused by the 2017 storm. If all this evidence were presented at trial, a jury could determine which damages were caused by the storm. Therefore, Plaintiff presented sufficient evidence of its damages to survive summary judgment.

*Id*. at *6.

*Prytania Park Hotel v. Gen. Star Indem. Co.*, CIV A. 94-3743, 1997 WL 250037 (E.D. La. May 9, 1997), is another example. The insurer moved for judgment as a matter of law following a jury verdict awarding the insured RCV. The insurer challenged several trial rulings, including the admission of repair invoices. The insurer argued that, based on the admissible evidence, the insured could not prove the amount paid for repairs and thus could not recover under the RCV loss payment provision.

The district court determined that, even without invoices, the jury verdict would not be overturned.

> Even without the invoices, a reasonable jury could have found as the jury did in this matter based upon the other evidence presented, such as the testimony of [plaintiff's representative] regarding his personal knowledge of expenditures on repairs and replacements, the hotel's checks, and the parts of the summary to which [plaintiff's representative] testified.

*Id*. at *3. The district court denied the motion for judgment and upheld the jury verdict.

In *Savanna Grove Coach Homeowners' Ass'n v. Auto-Owners Ins. Co.*, 19-CV-1513, 2020 WL 468905 (D. Minn. Jan. 29, 2020), the insured sued after the insurer refused to pay the appraised RCV. The insurer's position was based on the RCV loss payment provision; it claimed that the insured failed to prove that it spent more than the appraised RCV to repair the loss.

The insured moved for summary judgment, designating contractor invoices and time logs from its general contractor that showed expenses matching the appraised RCV. The insurer believed these invoices were fictitious. In the insurer's view, the insured needed to produce "copies of cancelled checks" showing payment, "back up documentation" supporting the general contractor's charges, and other documents to support the amounts in the invoices. The insured argued that these documents were necessary because it believed that the insured "received hefty

discounts in the cost of the materials due to 'volume' purchases and/or its long-standing relationship with vendors." *Id*. at *6.

The district court rejected the insurer's position. The district court made it clear that "doubts do not create a triable controversy"; that is, simply because the insurer doubted the insured's numbers did not require a trial. *Id*. After reviewing each of the insurer's arguments, the district court held that the insurer had designated no evidence that would call the insured's numbers into question. The district court entered summary judgment in the insured's favor, ordering the insurer to pay the appraised RCV amount. *Id*. at 8.

**i.**   *Defendant's Motion for Summary Judgment*

With these authorities in mind, the Court turns to Defendant's request that the Court grant summary judgment in its favor on the breach of contract claim. The most important piece of evidence is the Partial Waiver of Lien to Date and accompanying affidavit. (ECF No. 32-8 at 16–17). These documents were executed under oath by Bruce Curry, president of BGC Management Company, the general contractor that performed the repairs to the Property. The affidavit states, pointedly, that Plaintiff[5] "paid BGC to date the sum of $2,571,400.00 for the repairs to the" Property. (*Id*. at 16). The Partial Waiver states that the amount was paid to "Rebuild Burn Area." (*Id*. at 17). It references "Contract # 15-1371-CR2," the same contract number that appears on the estimate to repair the fire loss. (*Cf. id.* at 17, 18). This strikes the Court as strong evidence of the amount spent on repairs.

---

[5] Both the Partial Waiver and the affidavit state that the payments were made by Fort Wayne Garden Hospitality, Inc. That said, Defendant has not argued that this entity is distinct from Plaintiff, so the Court will assume that they are one in the same.

Curry's deposition only bolsters this conclusion. While Curry admits that BGC no longer has documents supporting the amount in the Partial Waiver, he is still certain that the Partial Waiver reflects payments for the fire loss.

> Q.   Okay. So at this point, you know, we talked earlier, sir, about the three or four, depending on how we're counting projects, that BGC Management Company did relating to the Wyndham property in Fort Wayne; that is the remodel, the wind event repair, the fire event repair and the renovations due to the performance improvement plan required by the franchiser Wyndham. So as you sit here today as the corporate representative for BGC Management Company, can you tell by looking at this partial lien, waiver of lien to date, which of any of those projects were involved in this partial waiver?
>
> A.   From the amount of money that I'm seeing on it, it's more than likely it's going to be the fire unit - - for the units, I can't remember how many rooms, but for the amount of money that was, it looks like it would have been the fire to me.

*   *   *   *

> Q.   And, again, I know I've asked this before, but I guess I want to make sure that I get it right for the record. What is the testimony of BGC Management Company as to the amount that 28th Street paid to BGC Management Company only for the repairs due to the fire only?
>
> A.   I believe it is that 2.5 million that we seen the partial lien waiver for.
>
> Q.   And what is the basis of your belief since there is no paperwork that's still available?
>
> A.   Well, that would have been the only reason I would have given them a partial lien waiver.

*   *   *   *

> Q.   So that lien release that we looked at earlier, Exhibit 3, could have been for everything; correct?
>
> A.   No. That was only 2.5 million. That would have been just the back area.

*   *   *   *

16

Q.     And your testimony is that this does not include any of the initial renovations that you described in your earlier testimony; is that correct?

A.     That's correct also.

(ECF No. 28-5 at 5; ECF No. 32-8 at 7–8, 10). Defendant's attorney made several attempts to shake Curry's conclusion that the Partial Waiver represented payments for the fire loss only. She failed each time.

The Court rejects Defendant's attempts to discredit Curry's testimony. Defendant states, "[t]he Bruce Curry Affidavit which makes a statement of how much he was actually paid does not differentiate at all between the fire event and anything else and under oath he admits such a conclusion." (ECF No. 28 at 20). This is technically true but ignores Curry's deposition testimony and the fact that the affidavit expressly references the Partial Waiver. (ECF No. 32-8 at 16).

Defendant then states that Curry "hesitantly relies upon the lien release, but in its clear and unambiguous language does not indicate that was the actual amount 'paid.'" (ECF No. 28 at 20). The Court cannot agree. There is nothing hesitant in Curry's deposition testimony. Rather, the testimony is consistent and clear that the Partial Waiver represents amounts for repair of the fire loss only. And the Partial Waiver expressly states that BGC is waiving the lien "in consideration of Two Million Five Hundred Seventy One Thousand Four Hundred.00 Dollars, $2,571,400.00, ***receipt of which is hereby acknowledged***." (ECF No. 32-8 at 17) (emphasis added). The Partial Waiver does, contrary to Defendant's representation, state that BGC received the money: that it was paid.

Defendant goes on. "What 28th Street would do here is require Cincinnati to go through each and every one of the 47 checks (which are not tied to any invoices) and somehow speculate as to what may or may not have been part of the fire event." (ECF No. 28 at 21). No. What Plaintiff would have Defendant do is rely on the repeated, under oath statements of its general contractor

as to the amount paid to repair the fire loss. To the extent there is uncertainty, it exists only in Defendant's mind.

Defendant also states, repeatedly, that Plaintiff "has no idea what it spent for fire repairs." (*See*, *e.g.*, ECF No. 28 at 20). This is a half-truth at best. Plaintiff's Rule 30(b)(6) representative testified:

> Q. Okay. What is the amount that 28th Street actually spent that is necessary to repair or replace the lost or damaged property due to the fire?
>
> A. Originally it was - - we believe it was actually the amount of our estimate, but it's more than that. But I don't know the final number.
>
> Q. So as you - -
>
> A. It's well above the awarded amount.

(ECF No. 32-7 at 6). It is true that Plaintiff has not given Defendant, or the Court, a precise dollar figure for its repair costs. It is also true, however, that the evidence shows consistent testimony that the figure is above the appraised RCV.

This record is very different from the cases upon which Defendant relies. For instance, in *Weidman v. Erie Ins. Grp.*, 745 N.E.2d 292 (Ind. Ct. App. 2001), the insured demanded payment of RCV before repairs had even begun. The issue in this case, how well an insured must support his repair costs, was not at issue in *Weidman*. Defendant describes *Emp'rs Mut. Cas. Co. v. Skoutaris*, 453 F.3d 915 (7th Cir. 2006), as "the 7th Circuit precedent." (ECF No. 35 at 11). But *Skoutaris* addresses the insured's repeated failure to sit for an examination under oath. As the *Skoutaris* court recognized, examination under oath clauses are treated differently under Indiana law than other similar cooperation clauses. *Id*. at 923–24 (discussing *Morris v. Econ. Fire & Cas. Co.*, 848 N.E.2d 663 (Ind. 2006). *Skoutaris*, then, is of little utility here.

Similarly, *Seeber v. Gen. Fire and Cas. Co*, 19 N.E.3d 402 (Ind. Ct. App. 2014), is not the "on point" authority that Defendant represents it to be. There, it was undisputed that the insured had paid less to repair the loss than he had been paid by the insurer. *Id*. at 411. Those are simply not these facts, no matter how much Defendant wants them to be.

Based on the authorities discussed above, the Court has no trouble concluding that Curry's affidavit and the Partial Waiver, by themselves, defeat Defendant's motion for summary judgment. They are admissible evidence that, if believed, could lead a jury to find for Plaintiff. Even if Defendant's characterizations of these documents were accurate, they are mere credibility attacks. Since the Court cannot make credibility determinations on summary judgment, *Payne*, 337 F.3d at 770, these baseless attacks cannot save Defendant's motion.

**ii.**   *Plaintiff's Motion for Summary Judgment*

But what of Plaintiff's cross-motion? A finding of genuine issues of material fact as to Defendant's motion is not the end of the inquiry. Discussing cross-motions for summary judgment, Professors Wright and Miller explained:

> [E]ach party, as a movant for summary judgment, bears the burden of establishing that no genuine dispute of material fact exists and that the movant is entitled to a judgment as a matter of law. The fact that one party fails to satisfy that burden on his own Rule 56 motion does not automatically indicate that the opposing party has satisfied its burden and should be granted summary judgment on the other motion. The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard. Both motions must be denied if the court finds that there is a genuine dispute of material fact. But if there is no genuine dispute and one or the other party is entitled to prevail as a matter of law, the court will render judgment.

§ 2720 Procedure on a Motion for Summary Judgment—Cross-motions, 10A Fed. Prac. & Proc. Civ. § 2720 (4th ed.). The Court must, then, evaluate Defendant's evidence to determine whether it has raised a genuine issue of material fact.

19

The Court has scoured the record and has found no evidence suggesting that Plaintiff paid anything less than the appraised RCV. Rather, Defendant's refusal to pay the appraised RCV appears to be based on its doubts over the veracity of Plaintiff's offers of proof. The deposition of Brian Philpot ("Philpot"), the individual responsible for denying Plaintiff's claim, shows this point. Take this exchange about the 47 checks submitted by Plaintiff:

> Q.     Were you concerned that the checks that were paid by the insured to this contractor were for some betterment of the property and you didn't want to pay for betterment?
>
> A.     I was concerned that the checks were unrelated to the damages.
>
> Q.     And what was the basis for that concern? Let me ask it this way, After you got this e-mail from Mr. Linder who told you that all repairs were completed, did you have any further concern about whether or not the insured had actually paid for the repairs?
>
> A.     I had concerns about what the amount the insured paid for the repairs.

(ECF No. 29-2 at 11–12). Circuitously, Philpot's concerns were based on his concerns.

Defendant repeatedly notes in its briefs that some of the 47 checks were found to be for things other than the fire repairs. This topic was addressed in Philpot's deposition.

> Q.     All right. And so was it your concern, then, that the insured, by submitting to you the 47 checks that they thought were for fire repairs, that they were lying to you and committing some sort of fraud?
>
> A.     There was no detail provided with the checks and no - - except for what was stated on the checks. Some of the checks were determined by our construction consultant to be unrelated to the fire loss. And most of the checks had no detail and some of the checks said payroll[6], which was a concern.
>
> Q.     So did you get out your calculator and back out the ones that said payroll and see, you know, if they still paid more than the amount of the recoverable depreciation at issue?
>
> A.     No.

---

[6] For his part, Linder testified that "maybe two or three" checks said payroll. (ECF No. 29-1 at 19).

20

(*Id*. at 15–16). This testimony torpedoes any argument that the rogue checks, which have never been identified in the record, are evidence that Plaintiff paid less than the appraised RCV. Even if this Court accepted that the checks overstated the amount Plaintiff paid to repair the loss, Defendant's failure to account for that overstatement leaves the Court in no position to conclude that there is a genuine dispute about whether Plaintiff spent more than the appraised RCV on repairs.

Linder's testimony is even more damaging to Defendant. Linder testifies, repeatedly, that Defendant's refusal to pay the recoverable depreciation was not because they had evidence Plaintiff spent less than the appraiser RCV. Instead, Defendant refused to pay because of its claimed ignorance of the amount spent.

> Q.    And for some reason you were not satisfied or Cincinnati was not satisfied that they spent the money on what they said they spent it on; is that correct?
>
> A.    I don't have documentation of what they actually spent on the repairs, no.
>
> \*   \*   \*   \*
>
> Q.    Okay. I'd like you to explain to me, what is your basis for - - Cincinnati's basis, as you understand it, for saying that the insured spent claim proceeds on anything other than fire damage?
>
> A.    I don't know what the insured spent money on.
>
> \*   \*   \*   \*
>
> Q.    What is your basis or Cincinnati's basis, as you understand it, for saying that the insured spent claim proceeds on anything other than fire damage?
>
> A.    I don't know - - again, I don't know what they spent it on.

(ECF No. 29-1 at 12, 14–15). In fact, Linder was later forced to admit that, except for two small repairs involving an elevator and a revolving door, he had no evidence that Plaintiff spent the claimed money on anything but fire repairs. (*Id*. at 18).

21

As the *Savanna Grove* court sagely put it, doubts do not create a triable controversy. Yet doubts are all Defendant offers in support of its refusal to pay the recoverable depreciation. It has not, and apparently cannot, point to a single piece of evidence that suggests, much less proves, that Plaintiff spent less than the appraised RCV on repairs. Defendant, then, has failed to designate evidence that would require the Court to submit the breach of contract count to a jury.

The Court notes that this outcome could have been different had Defendant's policy required the kind of specificity that it now demands. In *Bartholomew v. Sterling Ins. Co.*, 34 A.D.3d 1157 (N.Y. App. Div. 2006), the New York Appellate Division affirmed the dismissal of an insured's breach of contract claim. There, the insurer withheld 20% of the full cost of repairs until the repairs were complete. Upon completion of the repairs, the insureds demanded the retained amount, but provided no documentation supporting the repair costs. Citing the lack of documentation, the insured denied the claim.

The Appellate Division agreed with the insurer that it had the contractual right, under the RCV loss payment provision, to "calculate which of the three figures it was obligated to pay." *Id*. at 1158. But this conclusion was based, in large part, on the specific language of that policy. The insureds had contractually agreed to provide "records, including tax returns and bank microfilms of all canceled checks, relating to value, loss and expenses and permit copies and extracts to be made of them as often as [defendant] reasonably request[s]." *Id*. at 1159. Citing this language, the Appellate Division held that the insureds had failed to state a claim for breach of contract.

Defendant's policy is not so demanding. Defendant retains the rights to "examine and audit" Plaintiff's books and records, but no specific books or records are required. (ECF No. 40-1 at 9). If a loss occurs, the Policy gives Defendant the right to "examine [Plaintiff's] books and records" as well as copy those records, and further requires Plaintiff to sit for an examination under

22

oath, at which it can be asked about its books and records. (*Id*. at 52–53). But the Policy does not require Plaintiff to maintain any specific records or provide any specific records in the event of loss. Instead, the Policy forces Defendant to take its insured as it finds them. That may mean, as it did here, that the right to inspect and copy books and records isn't much of a right at all.

The designated evidence shows that Defendant breached its contract by failing to pay the appraised RCV. Summary judgment will be entered in Plaintiff's favor on the breach of contract claim.

**D.      *Genuine Issues of Material Fact Exist Regarding Plaintiff's Bad Faith Claim***

Under Indiana law, an insurer has a duty to deal with its insured in good faith, and there is a cause of action for the tortious breach of that duty. *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 519 (Ind. 1993); *see also Cnty. Line Towing, Inc. v. Cincinnati Ins. Co*., 714 N.E.2d 285, 291 (Ind. Ct. App. 1999). "The insurer's obligation of good faith and fair dealing includes an obligation to refrain from causing an unfounded delay in making payment; making an unfounded refusal to pay policy proceeds; exercising an unfair advantage to pressure an insured into settlement of his claim; and deceiving the insured." *Cnty. Line Towing, Inc*., 714 N.E.2d at 291. Thus, an insured who believes an insurance claim has been wrongly denied may have two distinct legal theories available, one for breach of the insurance contract and one in tort for the breach of the duty of good faith and fair dealing. *Id*. These two theories have separate, although often overlapping, elements, defenses, and recoveries. *Id*.

A good faith dispute about the amount of a valid claim or whether the insured has a valid claim will not supply the grounds for recovery in tort for the breach of the obligation to exercise good faith. *Becker v. American Family Ins. Grp.*, 697 N.E.2d 106, 108 (Ind. Ct. App. 1998). "This is so even if it is ultimately determined that the insured breached its contract. That insurance

companies may, in good faith, dispute claims, has long been the rule in Indiana." *Id*. Additionally, "the lack of diligent investigation alone is not sufficient to support an award. On the other hand, for example, an insurer which denies liability knowing that there is no rational, principled basis for doing so has breached its duty." *Id*. Thus, poor judgment and negligence do not amount to bad faith; the added element of conscious wrongdoing must also be present. *Colley v. Indiana Farmers Mut. Ins. Group*, 691 N.E.2d 1259, 1261 (Ind. Ct. App. 1998). "A finding of bad faith requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will." *Id*. Thus, a bad-faith determination inherently includes an element of culpability. *Id*.

Defendant's arguments in support of summary judgment on the bad faith issue rest, in large part, on its claim that it did not breach the contract. For the reasons set forth above, that ship has sailed.

Breach aside, the Court finds evidence on which a jury could base a finding of bad faith. First, the Court notes the lack of legal support for Defendant's position. Other than *Bartholomew* which, as discussed above, involved a very different policy, the Court cannot find a single case, from any jurisdiction, that requires more evidence to support a claim for RCV than Plaintiff provided. *Bowlers' Alley* is particularly noteworthy, as Defendant was a party to that case and lost summary judgment after presenting an argument much like the one it advances here. A rational and principled basis for a denial will not support a claim for bad faith, but Defendant has failed to show that its position here was either rational or principled.

Factually, Defendant's conduct could support a finding of bad faith. For instance, Defendant determined that Plaintiff was entitled to more than $1.2 million in ACV in May 2016 but did not pay that sum until November 2016. There is no explanation in the record for this significant delay. The parties also present different viewpoints on a significant delay in paying an

24

undisputed demolition claim. These specific circumstances, to say nothing of the fact that Defendant did not deny the claim for more than three years, could lead a jury to conclude that Defendant caused an unfounded delay in handling the claim.

Many of Defendant's stated reasons for denying the claim are also belied by the facts. As noted above, Defendant relies on a handful of allegedly unrelated checks but did not determine whether those checks affected the coverage decision. Defendant claims that the documents provided by Defendant leave it unable to pay the claim, but the evidence shows that Defendant paid a prior claim to this insured based on "similar documents." A jury could reasonably conclude that Defendant's conduct did not match its rhetoric, leading to a finding that the refusal to pay policy proceeds was unfounded.

A jury may very well conclude that Defendant's conduct fell within the bounds of good faith as it has been defined under Indiana law. But a jury may not. Based on the record before it, the Court finds that a reasonable jury could reach either conclusion. For this reason, Defendant's motion for summary judgment must be denied.

## III.    Conclusion

For these reasons, Defendant's Motion for Summary Judgment (ECF No. 27) is DENIED. Summary judgment is GRANTED in favor of Plaintiff and against Defendant as to Plaintiff's claim for breach of contract. Plaintiff's claim for the Breach of the Duty of Good Faith and Fair Dealing remains pending.

SO ORDERED on February 15, 2022.

 s/ *Holly A. Brady*
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT